HELANE L. MORRISON (CA BAR NO. 127752)
ROBERT L. MITCHELL (CA BAR NO. 161354)
KATHLEEN K. BISACCIA (CA BAR NO. 157324)
CAROLYN A. SAMIERE (CA BAR NO. 118353)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 1100
San Francisco, California 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>JESSE DEAN BOGDONOFF and WELLNESS TECHNOLOGIES, INC., a Nevada corporation,<br><br>Defendants. | Case No. C 03 4384 MJJ<br><br>COMPLAINT |

Plaintiff the Securities and Exchange Commission (the "Commission") alleges:

## INTRODUCTION

1. Defendants Wellness Technologies, Inc. ("Wellness") and Jesse Dean Bogdonoff, a Northern California investment adviser and its principal, fraudulently induced a trust established for the citizens of the Kingdom of Tonga, an island nation located in the South Pacific, to invest $24.5 million in highly speculative and unsuitable securities. As a result of Defendants' fraudulent conduct, the Tonga Trust Fund (the "Trust") lost substantially all of its investment.

2. From June 1999 to November 2001, Wellness and Bogdonoff made material misrepresentations to the Trust's trustees (the "Trustees") about the safety, character and profitability of three highly speculative investments. Based on these misrepresentations, the Trust invested $24.5 million in the three ventures.

3. For nearly two years, Wellness and Bogdonoff reassured the Trust that its investments continued to be safe and profitable. In fact, Wellness and Bogdonoff knew, should have known or recklessly disregarded the fact that the investments were highly speculative and that the companies were in precarious financial circumstances. Within two and one-half years after the trust invested the money, all of the investments were in default, and the Trust has yet to recover its funds.

4. Wellness and Bogdonoff obtained ill-gotten gains as a result of their fraudulent conduct, including at least $2 million in commissions from companies whose securities they recommended and $540,000 in advisory fees charged directly to the Trust.

5. The Commission seeks a court order enjoining Wellness and Bogdonoff from future violations of the federal securities laws, directing them to disgorge all commissions and fees they received in connection with the Trust investments plus prejudgment interest, and imposing civil monetary penalties against them.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C.§ 80b- 9(d)]. This Court has jurisdiction over the subject matter of this action pursuant to Sections 21(e) and 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 77u(e) and 78aa] and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(b) and 80b-14].

7. Wellness and Bogdonoff directly or indirectly made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, practices and courses of business and transactions alleged herein.

8. This district is an appropriate venue for this action under Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 214 of the Advisers Act [15 U.S.C. 80b-14]. Wellness has its principal place of business, and Bogdonoff resides, in the Northern District of California.

9. Assignment to the San Francisco Division is proper under Local Rule 3-2(c) and (d) because a substantial part of the events or omissions which give rise to the claims described herein occurred in San Francisco County, California and Sonoma County, California.

## DEFENDANTS

10. Jesse Dean Bogdonoff, age 48, is a resident of Penngrove, Sonoma County, California. At all relevant times, Bogdonoff owned and was the President and sole account manager of Wellness Technologies, Inc.

11. Wellness Technologies, Inc. is a Nevada corporation doing business in the State of California. At most relevant times, its principal place of business was located at 442 Eighteenth Avenue, San Francisco, California. Currently, its principal place of business is in Penngrove, Sonoma County, California.

## OTHER RELEVANT PARTY

12. The Tonga Trust Fund is a trust fund established in 1988 pursuant to the Tonga Trust Fund Act, Act 49 of 1988 of the Laws of the Kingdom of Tonga. The purpose of the Trust is to hold certain funds raised by the Government of Tonga in trust for the benefit of the Tongan citizens. The Trust's principal place of business is in the capital of Tonga, Nuku'alofa. Three trustees govern the Trust; they are ministers of the Government of Tonga, appointed by the King and his council.

## FACTUAL ALLEGATIONS

### A. Bogdonoff's Prior Experience with the Trust

13. From approximately 1989 to June 1999, the Trust held most of its assets of approximately $20 million in insured bank accounts and conservative investments. Initially, the funds were held in a Bank of America checking account, and later some of the assets were invested in United States Treasury Bills and Treasury Notes. During this period, the Bank of America served as the investment adviser for the Trust.

14. In approximately March 1994, Bogdonoff, then an investment adviser employed by Bank of America, was assigned to the Trust account. He encouraged the Trustees to move the Trust's funds into a variety of assets, including equity funds and securities issued by the United States Government. By the end of May 1999, the Trust's assets had grown to approximately $26.5 million.

15. Based on his experience in working with the Trust, Bogdonoff knew that the Trust had a conservative investment policy, and that its primary objective was the preservation of capital.

**B. Bogdonoff's Efforts to Secure Commissions on Highly Speculative Investments for the Trust**

16. In approximately May 1999, Bogdonoff resigned from the Bank of America and began to pursue an independent investment advisory business through a company he owned, Wellness Technologies.

17. Also at about this time, Bogdonoff reached agreements with two companies to pay him commissions in return for any investment funds he raised for them. One was a firm involved in arranging investments in viatical contracts. A viatical contract is an agreement for the purchase or sale of the benefits of life insurance policies insuring persons with short life expectancies. In May 1999, Bogdonoff entered into a written agreement to become a sales representative for a "finder company"--i.e., a company that located investors who would purchase interests in a group of viatical contracts originated by another company. Under this agreement, the finder company agreed to pay Bogdonoff commissions, set by a schedule, if the Trust invested in viaticals through the finder company.

18. In addition, Bogdonoff reached an agreement with a company that was attempting to develop an alternative energy device known as a "flywheel". Bogdonoff told the flywheel company that he would recommend that the Trust invest over a million dollars in the company. In return, the company promised to pay Bogdonoff a commission of seven percent on any investments that Bogdonoff obtained for the company.

**C. In June 1999, Wellness and Bogdonoff Made Fraudulent Misrepresentations to Induce the Trust to Invest in Two Highly Speculative Investments**

19. In June 1999, Bogdonoff met with the Trustees in Tonga to propose that they hire his company, Wellness, to replace the Bank of America as the investment adviser for the Trust. From June 14 to June 23, 1999, Bogdonoff attended a series of meetings in Tonga in which he assured the Trustees and other Tongan government officials that Wellness's recommendations for the Trust

would be safe and profitable. As a result of these meetings, the Trust selected Wellness to replace the Bank of America as its investment adviser.

20. During the meetings with the Trustees, Wellness and Bogdonoff recommended that the Trust invest in viatical contracts and in the flywheel venture, and made several material misrepresentations about the proposed investments.

21. With regard to viaticals, Wellness and Bogdonoff told the Trustees, among other things, that this investment would involve no market risk; that the return of principal would be 100% percent guaranteed; and that the investment would offer a secured rate of high returns at no risk. They further characterized it as the perfect no risk investment. Wellness and Bogdonoff told the Trust that, in return for a $20 million investment, the viatical firm would guarantee that it would pay the Trust $26 million in June 2001. Based on these and other representations, in July 1999 the Trust invested $20 million in an investment program in viaticals offered by a privately held entity, Millenium Asset Management Services ("MAMS").

22. Wellness and Bogdonoff knew, should have known or recklessly disregarded the fact that the representations they made concerning the safety of investing in MAMS were false. MAMS was formed in March 1999 – just three months before the Trust's investment -- and had conducted only a small amount of viatical business using a variety of names. As of June 1999, MAMS had only $298,637 in cash and limited other assets. Moreover, MAMS's business consisted of buying only "contestable" life insurance policies—i.e., policies subject to a two-year period in which the insurance carrier could contest its obligation to pay benefits if it found evidence that the insured had committed suicide. In addition, in May 1999 Bogdonoff learned of several general risks relating to viatical investments, including the risk that the insured might outlive his life expectancy (which could reduce or eliminate the value of the viatical contract). As a result of these facts (which Wellness and Bogdonoff failed to disclose to the Trust), there was no reasonable basis for Wellness's and Bogdonoff's representations to the Trust concerning the safety of the viatical investment.

23. With regard to the flywheel investment, Wellness and Bogdonoff described it as an investment in "bonds", and as a conservative means of eliminating stock market risk while earning a

substantial income. Based on these and other representations, in July 1999 the Trust invested $4 million in the privately held flywheel venture.

24. Wellness and Bogdonoff knew, should have known or recklessly disregarded the fact that the claims they made regarding the flywheel investment were false. Prior to the time the Trust made its investment, a principal of the flywheel company discussed the company's financial condition with Bogdonoff. The principal disclosed that the firm had significant financial difficulties, and that investors could lose all of their money. The principal also provided Bogdonoff with financial data on the company. Based on this data, Bogdonoff knew that the proposed investment by the Trust would constitute at least 50% of the company's operating capital. In addition, Wellness and Bogdonoff falsely characterized the investment as a purchase of "bonds". In fact, Wellness and Bogdonoff invested the Trust's money in preferred stock issued by the flywheel company.

### C. In June 2000, Wellness and Bogdonoff Made Fraudulent Misrepresentations to Induce the Trust to Invest in a Third Highly Speculative Investment

25. In June 2000, Bogdonoff caused the Trust to make a third highly speculative investment—a $500,000 investment in a privately held Internet film distribution company. The terms of the note provided that the Internet company would repay $500,000 to the Trust, together with interest at the rate of 10% per year, on January 1, 2001. In a letter dated June 20, 2000, regarding the investment, Bogdonoff told the Trustees that it was a "conservative approach" offering liquidity.

26. Wellness and Bogdonoff knew, should have known or recklessly disregarded the fact that these claims were false and that an investment in the Internet company was highly speculative. Only a few weeks after Bogdonoff invested the Trust's funds in the Internet company, Bogdonoff began soliciting funds from other investors to prop up the struggling firm. At a meeting in July 2000, Bogdonoff told potential investors about the Internet company's declining financial condition, including the likelihood that the company would slide into bankruptcy if it did not obtain an immediate cash infusion. Thus, Wellness and Bogdonoff lacked a reasonable basis for their representations to the Trust that an investment in the Internet company was "conservative" and offered "liquidity."

**D. Following the Trust's Initial Investments, Wellness and Bogdonoff Made Further Material Misrepresentations Concerning the Status of the Investments**

27. Between October 1999 and April 2001, Wellness and Bogdonoff sent several written reports to the Trustees in which they purportedly described the status of the viatical, flywheel and Internet investments. These reports contained material misstatements regarding the financial condition of the companies and the safety and probability of repayment of the Trust's investments.

28. With regard to the viaticals, Wellness and Bogdonoff repeatedly represented that the investment was safe and secure. In various reports they said the investment was "performing as designed," and that it "continues to accrue value." In a January 2001 report, Wellness and Bogdonoff stated:

> The Trust asset allocation strategy which utilizes the safety and stability of Notes backed by US life insurance contracts, known as Viatical Contracts and Life Settlement Contracts, continues to deliver on its promise to provide significant safety, insulation and protection from the very real risks associated with the changes in interest rates plaguing the bond market.

29. In an April 2001 report, Wellness and Bogdonoff advised the Trustees that the viatical investment showed "continued steady growth." They also reiterated that the investment "continues to deliver on its promise to provide significant safety, insulation and protections" from the risks of the bond markets.

30. Wellness and Bogdonoff knew, should have known or recklessly disregarded the fact that each of these claims was false. According to two principals of the viatical company, MAMS, between July 1999 and June 2001 (when MAMS was supposed to pay $26 million to the Trust), Wellness and Bogdonoff never inquired about the status of the viatical investment, except to obtain summary statements from the company that only acknowledged the Trust's investment. Specifically, Wellness and Bogdonoff failed to obtain proof that MAMS had received title to any life insurance policies, or that such policies had been assigned to the Trust. Bogdonoff admitted his ignorance of the status of the Trust's viatical investment in a March 2001 letter to one MAMS principal, writing that:

> I regret that I have no knowledge regarding the status of any of the contracts that [the viatical investment company] purchased to secure those funds. I cannot begin to guess if any of those policies have been turned and what tract [sic] record may have been developed as a result of such sales since July 1999.

31. In June 2001, MAMS defaulted on its obligation to pay the Trust $26 million, and to date the Trust has been unable to recover any of its MAMS investment. In July 2003, MAMS filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of California.

32. Wellness and Bogdonoff also made material misrepresentations concerning the status of the flywheel investment. For example, in written reports dated July 1, 2000, October 29, 2000 and January 30, 2001, Wellness and Bogdonoff told the Trustees that the flywheel company would undertake an initial public offering ("IPO") of its stock in the near future. Wellness and Bogdonoff lacked any reasonable basis for making such a claim. In fact, a principal of the flywheel company had previously informed Bogdonoff that the company, which had yet to develop a commercially viable product, had several hurdles to clear before it could pursue an IPO.

33. Wellness and Bogdonoff also failed to disclose material adverse financial information regarding the flywheel company, including that from at least June 1999 through April 2001 the flywheel company was unable to generate enough revenues to meet its liabilities on a timely basis. The flywheel company's principals had discussed the company's cash flow problems with Bogdonoff on several occasions and given him financial statements disclosing these problems. However, Wellness and Bogdonoff never revealed the statements to the Trustees, and they concealed the flywheel company's tenuous financial condition from the Trustees. To date, the Trust has not recovered any of its investment in the flywheel company.

34. Wellness's and Bogdonoff's reports also contained false statements and omissions concerning the Internet film distribution company's financial status. For example, in an October 2000 report to the Trustees, Wellness and Bogdonoff stated that there were "no major changes in the state of [the Internet company]. . . ."

35. Wellness and Bogdonoff knew, should have known or recklessly disregarded the fact that this claim was false. As noted above, in July 2000 Bogdonoff had warned a group of potential

investors that the Internet company could slide into bankruptcy if it did not obtain an immediate cash infusion. Bogdonoff failed to inform the Trustees about the Internet company's decline.

36. In January 2001, the Internet company failed to repay the Trust under the terms of the promissory note, and in February 2001 it filed for bankruptcy protection in the United States Bankruptcy Court for the Western District of Washington. To date, the Trust has not recovered any of its investment in the Internet company.

**E. Wellness's and Bogdonoff's Investment Recommendations Were Unsuitable for the Trust**

37. As the Trust's investment adviser, Wellness had a duty to make investment recommendations that were suitable for the Trust, in light of its financial circumstances and conservative investment objectives. Wellness and Bogdonoff violated that duty by recommending that the Trust invest in the viatical, flywheel and Internet ventures described above. Each investment involved a privately held company engaged in a highly speculative business, with no substantial operating history. Wellness and Bogdonoff magnified the risk of loss to the Trust by recommending that it invest an unreasonably large portion of its assets in these investments, instead of diversifying the Trust's holdings in other investments.

**F. Wellness and Bogdonoff Were Unjustly Enriched by Their Fraudulent Conduct**

38. In return for inducing the Trust to invest, Wellness and Bogdonoff received at least $1.8 million in commissions from MAMS and $200,000 in commissions from the flywheel company. In addition, from June 1999 through October 2001 the Trust paid Wellness and Bogdonoff at least $540,000 in advisory fees.

39. Wellness and Bogdonoff failed to provide the disinterested, professional investment advisory services to which the Trust was entitled. Instead, Wellness and Bogdonoff caused the Trust to invest the vast majority of its funds in highly speculative investments that were at odds with the Trust's conservative investment objectives, but which generated high commissions for Wellness and Bogdonoff. As such, Wellness and Bogdonoff were unjustly enriched by the commissions and advisory fees they obtained.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Wellness and Bogdonoff**

40. The Commission realleges and incorporates by reference Paragraphs 1 through 39 above.

41. By engaging in the conduct described above, Wellness and Bogdonoff, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instruments of interstate commerce, or of the mails, or of a facility of a national securities exchange, with scienter: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities and upon other persons, in connection with the purchase or sale of a security.

42. Wellness and Bogdonoff violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Sections 206(1) and 206(2) of the Advisers Act By Wellness and Bogdonoff**

43. The Commission realleges and incorporates by reference Paragraphs 1 through 39 above.

44. At all relevant times, Wellness acted as an investment adviser to the Trust. Wellness, for compensation, engaged in the business of advising the Trust, either directly, or through publications and writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.

45. Wellness, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly: (1) with scienter, employed devices, schemes, or artifices to defraud clients or prospective clients; and (2) engaged in transactions, practices, or courses of business, which operated as a fraud or deceit upon clients or prospective clients.

46. Bogdonoff, as Wellness's President and sole account manager, knowingly provided substantial assistance to Wellness's violations alleged in paragraph 45, above.

47. By reason of the foregoing, Wellness violated and Bogdonoff aided and abetted Wellness's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C.§§ 80b-6(1) and 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Permanently enjoin Wellness and Bogdonoff from acts or practices that violate, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Rule 10b-5 [17 C.F.R. § 240.10b-5];

II.

Permanently enjoin Wellness and Bogdonoff from acts or practices that violate, directly or indirectly, Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)];

III.

Order Wellness and Bogdonoff to disgorge all commissions, fees and other benefits they obtained as a result of the investments they recommended for the Trust, plus prejudgment interest;

IV.

Order Wellness and Bogdonoff to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)]; and

VI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 29, 2003

Respectfully submitted,

Carolyn Samiere
Attorney for Plaintiff
Securities And Exchange Commission